IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EMMERT INDUSTRIAL CORPORATION,    )
dba Emmert International,           )
                              )
        Plaintiff,          )  Case No. CV05-514-HU
                              )
      vs.                )  **AMENDED**
                              )  OPINION AND ORDER
CITY OF MILWAUKIE, OREGON,      )
                              )
        Defendant.         )

Jonathan Clark
O'Donnell & Clark
1650 NW Naito Parkway, Suite 302
Portland, Oregon 97209
    Attorneys for plaintiff

Charles E. Corrigan
Ramis Crew Corrigan
1727 NW Hoyt Street
Portland, Oregon 97209
    Attorneys for defendants

HUBEL, Magistrate Judge:

On August 3, 2006, Emmert's counsel wrote a letter to the court which the court has deemed a motion to reconsider the Opinion and Order filed on July 7, 2006 (doc. # 65). The court deemed a July 10, 2006 letter from the City's counsel as a response to Emmert's motion to reconsider, notwithstanding the earlier date (doc. # 66). By minute order dated August 15, 2006, the court granted the motion to reconsider (doc. # 64).

The motion to reconsider was based on a factual error in the Discussion section of the Opinion and Order, relating to a provision of the Final Agreement. The court's discussion was based on paragraph 3 of the Final Agreement, rather than on the applicable paragraph 11.

However, the primary basis for the court's ruling was the case of <u>Louisiana Pacific Corp. v. Beazer Materials & Services, Inc.</u>, 842 F. Supp. 143 (E.D. Cal. 1994), and the applicability of the <u>Beazer</u> court's analysis to the facts of this case. The discussion of paragraph three of the Final Agreement was an alternative basis for the court's holding.

Upon reconsideration, and in light of the issues raised in the parties' letters to the court, I am vacating the Opinion and Order of July 7, 2006, and filing this Amended Opinion and Order.

This is an action for violation of federal civil rights, brought under 42 U.S.C. § 1983, and for breach of contract. For

its civil rights claims, plaintiff asserts that it was deprived of its "protected liberty interest in access to the courts" and of its property interest in a permit.

Plaintiff Emmert Industrial Corporation, dba Emmert International (Emmert) is an Oregon corporation doing business in the City of Milwaukie, Oregon. Defendant is the City of Milwaukie (City). Defendant moves for summary judgment on the claims asserted under 42 U.S.C. § 1983.

### Factual Background

On October 31, 2002, Emmert, the City, and a third party, Richard Peterson, entered into a contract ("the '02 Contract") dealing with the disposition of a structure known as the Marino or Marinos House (the House) which Peterson owned. The '02 Contract stated that the House was the subject of an abatement proceeding initiated by the City of Milwaukie on October 8, 2002,[1] and that Peterson, the owner of the House, was in the process of

---

[1] In May 2001, the House was set on blocks on property owned by the Union Pacific Railroad in the City. Peterson had intended to convert it to professional offices. After Peterson failed to perform in accordance with certain agreements he had with the City, the City declared the House a nuisance and issued a Notice to Abate. A City code enforcement officer contacted Terry Emmert, the principal of Emmert International, and asked him if he would be interested in relocating the House. In a letter to the City dated October 25, 2002, Emmert proposed to move the house, for a fee of $14,950, to a piece of property Emmert owned, and to guarantee the relocation and complete set up at the new location. In the letter, Emmert also stated that it would make all the arrangements with all the governmental agencies for the new location, and that the new site was a legal building lot within the city limits.

3    – **AMENDED** OPINION AND ORDER

applying for and receiving a demolition permit from the City when Peterson, Milwaukie and Emmert began negotiating a proposal under which Peterson would convey his interest in the building to Emmert in exchange for Peterson's release from liability to the City pertaining to the nuisance abatement process. *See* Amended Complaint, Exhibit 2.

Under the terms of the '02 Contract, Peterson conveyed his interest in the house to Emmert, and Emmert agreed to "secure the necessary moving permit and any other necessary permits from Milwaukie ... and promptly move the building to a location deemed acceptable by Milwaukie."[2] <u>Id.</u> Emmert agreed to be solely responsible for moving the building. <u>Id.</u> The '02 Contract stated further that Emmert "shall remove the building from its existing location as soon as all utilities can cooperate wire lifting for the move" [sic].

The City contends that initially, the parties contemplated that the move would be completed no later than December 21, 2002, roughly 32 days after the '02 Contract was signed. There is some evidence to support this contention, since the '02 Contract originally so stated-- the words "no later than December 21, 2002" have been lined out and replaced with the handwritten

---

[2] The evidence indicates that two permits from the City were required, a moving permit and a building permit, in addition to whatever agreements were necessary to hook up the utilities.

phrase, initialed by the parties, "as soon as all utilities can cooperate wire lifting for the move." Id.

At the time of its October 25, 2002 letter to the City, Emmert contemplated moving the House to a lot owned by Rene Bagley, on 30th and Madison, or to a lot owned by Emmert on Balfour Street, adjacent to the Clackamas County Housing Authority. Bagley had told Emmert two years earlier that the City would have approved siting the House on Bagley's property. When Emmert had the Bagley property surveyed, however, it was too short on one side to meet the building code, which meant Emmert would have to obtain a variance before moving the House there.

By mid-December, Emmert had still not applied for a permit to move the House. On December 16, 2002, John Gessner, the Planning Director for the City, sent a letter to Terry Emmert, which stated, in pertinent part:

> Please be advised that the City finds that you have not complied with the October 31, 2002 agreement between yourself, Richard Peterson and the City regarding disposition of the house being stored on 21st Avenue. The agreement requires the prompt removal of the structure from its present location. On your request the agreement was modified by changing the date by which the building is to be removed from December 2, 2002 to "... as soon as all utilities can be coordinated." The city agreed to this amendment based on your representation that a suitable site was available for its relocation. To date Emmert has not applied for a city house-moving permit.
>                           * * *
> A complete house moving permit application must be submitted to the city no later than December 23, 2002. The application shall include evidence of your

5   – **AMENDED** OPINION AND ORDER

request to the appropriate utility companies for
moving overhead cables and traffic lights as required
for the house move. The building shall be moved from
the site no later than two weeks following approval
of the house move application and approvals for the
utility move. Failure to comply with this order shall
result in a compliance action as allowed by the
Milwaukie Municipal Code.

No house moving permit was submitted to the City by
December 23, 2002. On December 26, 2002, the City issued a Notice
to Abate, declaring that if the nuisance of the House was not
abated within 10 days, the City "may abate the nuisance and the
cost of abatement shall be a lien against the property." The
Notice to Abate allowed the owner of the property to protest the
notice of abatement. Gessner Declaration, Exhibit 2.

By letter dated January 2, 2003, Emmert protested the
abatement notice. Gessner Declaration, Exhibit 3. The letter
stated that Emmert had a location for the house at a lot owned by
Rene Bagley, and that Mr. Bagley had requested that a variance be
granted due to a lack of 1'4" to meet the City's 5' setback code.[3]

_____

[3] Mr. Bagley did approach the City's planning department about
a building permit and the variance that would have been necessary
had the House been moved to Bagley's property. According to
Emmert's answers to the City's interrogatories, Mr. Bagley was told
by the City's planning department staff that they did not think the
request met the code provision stating that the situation had to be
unusual to substantiate a variance. But Emmert has also proffered
the deposition testimony of Planning Director Gessner that he had
the authority to grant a variance that was within 10% of the
standard that applied, and could have granted such a variance for
the Bagley property, but thought such a variance could not be
obtained quickly enough to satisfy the City's deadline.

The letter stated that Emmert had an alternate property that was currently land locked by Clackamas County Housing Authority,[4] but that Emmert saw "no problem in receiving an easement to allow street frontage for this property" once the Executive Director of the Housing Authority returned to his office on January 6, 2003.

In response to Emmert's letter, the City Council held a hearing on January 7, 2003, continued to January 21, 2003. At the January 21, 2003 hearing, Emmert submitted a report that included a "Work in Progress Chronology" that proposed April 27, 2003, as the deadline for Emmert's relocation of the House. Gessner Declaration, Exhibit 6, p. 4. The City Council took testimony from City staff, Emmert representatives, and Milwaukie residents

---

A letter to Emmert from City Manager Swanson, dated March 13, 2003, states that a variance would take longer than the month remaining until the April 28, 2003 deadline set by the City Council for abatement of the nuisance, and that obtaining a variance required the applicant to meet the burden of proving certain standards in the Milwaukie Municipal Code, including that the property in question has "unusual conditions over which the applicant has no control," that there are "no feasible alternatives to the variance and that the variance is the minimum variance necessary to allow the applicant the use of his/her property in a manner substantially the same as others in the surrounding area," and that "adverse effects upon other properties that may be the result of this variance shall be mitigated to the extent feasible." Clark Declaration, Exhibit 8. Swanson states in the letter that he thinks Emmert might have difficulty establishing the criteria for a variance, but that Emmert has the right to pursue a hearing before the Planning Commission. Id. Swanson continued, "Staff's only desire was to apprise you of the difficulty presented by the timing and the variance standards as applied to this set of facts." Id. In any event, the necessary variance for the property owned by Bagley was not obtained.

[4] I.e., the Balfour Street property.

7    – **AMENDED** OPINION AND ORDER

about the House. At the end of the hearing, the City Council voted to hold the nuisance declaration in abeyance until after April 27, 2003, and to vacate the order if the house was moved by April 27, 2003. See Firestone Declaration, Exhibit 1, p. 16-17.

On January 23, 2003, Gessner sent Emmert a letter, noting that it had not to date submitted any applications for the required permits. The letter discussed the zoning approvals that would be required in order to site the House at the Bagley property on 30th and Madison. Clark Declaration, Exhibit 7.

Gessner said he understood the delay in moving the building was due to efforts to site the building at the Bagley property, "notwithstanding the time limitations imposed by the ['02 Contract], and notwithstanding the consistent advice of city staff that the site was not suitable." He then gave the reasons the Bagley site was deemed unsuitable. Id. They included the necessity of obtaining approval to reconfigure the two lots that comprised the property, a process that would require at least 60 to 90 days, and obtaining a variance, which would also take a minimum of 60 to 90 days, and which would require Emmert to meet certain approval criteria. Id.

On March 14, 2003, Gessner sent Emmert another letter, following up on a telephone conversation. Clark Declaration, Exhibit 8. The letter stated that Gessner had "researched both options you mentioned," i.e., the Bagley property and the Balfour

Street property. Gessner noted that it was his understanding the County would not grant the necessary easement for the Balfour property. Id.

With respect to the Bagley property, Gessner pointed out that it posed several challenges, one of which was timing. Gessner noted, "April 28 is fast approaching, and a variance request will require more time than we have." In addition, Emmert would be required to meet the burden of proving certain standards contained in Milwaukie Municipal Code Section 19.702.1, which included showing that the property had unusual conditions over which the applicant had no control; there were no feasible alternatives to a variance; the variance was the minimum necessary to allow the applicant to use the property; and any adverse effects of the variance upon other properties would be mitigated. Id. The letter stated that Emmert might "have difficulty establishing" these criteria, but noted that Emmert had the right to pursue a hearing before the Planning Commission. Id.

Gessner then reminded Emmert about the consequences of the April 28 deadline, saying, "At its last hearing the Council found that a nuisance existed on the subject property. That finding was held in abeyance until April 28, 2003, at which time it would be vacated if the house was removed from the property. In the event it was not, the nuisance finding would stand." Id.

9   – **AMENDED** OPINION AND ORDER

The Clackamas County Commission denied Emmert's request for a utility easement at the Housing Authority site on Balfour Street in March 2003. Corrigan Declaration, Exhibit 2, p. 8. Emmert then considered a lot on Malcolm Street, but decided that the utility fees made that site unreasonable. Id.

On April 8, 2003, Swanson wrote a letter to Terry Emmert, saying,

> I haven't heard anything and am concerned as the date by which abatement was to occur is fast approaching. According to Milwaukie Municipal Code Section 8.04.190(A), I am responsible for taking action to abate the nuisance if the property owner has not abated it "within the time allowed." The abatement costs incurred by the City are then assessed against the owner pursuant to Milwaukie Municipal Code Section 8.04.200. Of course, if the structure is moved prior to April 28, the order of abatement is vacated, and no further action need be taken. If you wish to meet regarding this matter please give me a call. ...

Clark Declaration, Exhibit 9.

In May 2003, Emmert considered a lot on Jefferson Street, but the adjoining property owners refused to convey a five-foot strip of property necessary to establish a legal lot. Corrigan Declaration, Exhibit 2, p. 8.

On Friday, May 2, 2003, Swanson wrote an e-mail to Gessner, saying that Terry Emmert had a line on another piece of property, located at 3916 Jackson. Clark Declaration, Exhibit 12. The Jackson Street property was also problematic, because it was in

10  – **AMENDED** OPINION AND ORDER

an R-5 zone, which required a lot size of 5,000 square feet. The
Jackson Street lot was only 4,500 square feet. Id. Swanson asked
Gessner,

> So what will he have to do to make the move and
> legally set the house down? That is, what steps will
> the City require? ... What would he have to provide,
> how long would it take, and what is your prognosis of
> his success (assuming that we do not stray out of the
> path that we have required others similarly situated
> to follow)? Is there any discretion we can exercise
> to move things along, and if so, have we done similar
> things before?

Id. Swanson continued,

> Gary [Firestone, City Attorney] might well tell me
> that I have no choice but to proceed with abatement
> in any event and that I cannot extend anything. ...
> I know, I know, I'll get pummeled by those who want
> it gone if I give him a chance and I can do so-but if
> I can do so and dictate the steps and immediately
> pull the plug if he fails, all will be forgotten if
> he succeeds.

Id.

On Sunday, May 4, 2003, Swanson sent an e-mail to Michelle
Matesi, an Emmert employee, discussing the Jackson Street site.
Clark Declaration, Exhibit 10A. Swanson stated that he had a
staff person make a field visit to the property, and that the
staff person reported that there was an old structure adjacent to
the property, on 3830 Jackson, that had received a five-foot
conveyance from 3916. Clark Declaration, Exhibit 10A. Swanson
suggested that as 3830 Jackson was in a bad state of repair,
Emmert might consider removing that property and having the five
feet reconveyed to 3916 Jackson, so as to have the required lot

11  - **AMENDED** OPINION AND ORDER

size. Swanson added,

> One caution regarding all of the above: I was not
> able to discuss the issue of whether or not I had any
> discretion to do anything other than to pursue the
> abatement. The City Attorney was not in, so I have to
> pursue that first thing Monday morning. I will be
> contacting him first thing, and I will call you
> immediately thereafter, as time is very short.

Id.

On Monday, May 5, Swanson asked John Gessner whether the
3916 Jackson property was eligible for an administrative
variance. Clark Declaration, Exhibit 10B. Gessner thought it
unlikely. Id.

On June 5, 2003, the City presented, and Milwaukie
Municipal Court Judge Ronald Gray signed, a "Warrant to Enter and
Abate," authorizing the City to enter the property "for the
purpose of inspection, estimation, and abatement of existing
violations on the premises ... including removal of the structure
as a whole." The warrant required the City to commence execution
of the warrant within 10 days, and to complete execution of the
warrant within four weeks. The warrant was faxed to Emmert by
Gary Firestone, City Attorney, on June 6, 2003. Corrigan
Declaration, Exhibit 12.

At that point, Emmert had applied for the necessary permits
to move the House to the Jackson Street site. On June 10, 2003,
the City Council held a work session, a large portion of which
was devoted to discussion among Council members, Terry Emmert and

others about the proper disposition of the House.

On June 11, 2003, Swanson e-mailed a proposed agreement to Terry Emmert, which Swanson and Emmert discussed in a telephone conversation. On June 17, Swanson sent Emmert a letter and a revised document entitled "Final Agreement." Amended Complaint, Exhibit 1.

The Final Agreement was dated June 18, 2003, and recited that the City would issue the building permit to relocate the House to Jackson Street when fees were paid. The Final Agreement further recited that after the building permit was issued, a permit to move the structure would have to be obtained and coordination with public utilities would required to move the House to the new location. The Final Agreement provide:

1.   Within three days, Emmert will clean up the property on which the house is stored and make the structure "presentable and safe."

2.   The status quo will remain unchanged so long as the agreement remains in effect (i.e., Emmert agrees not to make any legal challenges to the City's decisions relating to the structure and the City agrees that it will not issue a notice to proceed to its demolition contractor).

3.   Emmert will obtain the building permit and pay the City all fees, including system development charges,

payable at the time of the issuance of the permit.

4.    Emmert will coordinate moving of the house with PGE and any other utility whose facilities might be affected by the move. Emmert is to attempt to schedule the move at the earliest possible date. Emmert agrees that the City may contact each of the utilities to obtain current information about the move.

5.    Emmert is to apply to the City for a building moving permit and comply with all provisions of the municipal code relative to the permit, including the insurance requirement. The City promises to process the building moving permit application "in a timely fashion."

6.    Emmert is to secure the agreement of the City's demolition contractor to an extension of the demolition contract so that the contract will remain in effect, and if any of the deadlines imposed by the agreement are not met, the demolition can go forward. If the agreement is fulfilled and the structure is moved so that demolition is not required, Emmert is to pay the demolition contractor "such amounts as are due to the demolition contractor." Emmert is permitted under the agreement to negotiate with the demolition contractor as to the amount payable. The City authorizes Emmert to enter into such negotiations, but

reserves the right to final approval or rejection of any amendment or extension of the demolition contract.

7.   Emmert is to pay $4,219.53 to the City to partially reimburse the City for the costs of its efforts to abate.

8.   Emmert is to secure a performance bond within five days of the effective date of the agreement in the amount of $10,000 "with provisions satisfactory to the City" to secure performance of the agreement. For purposes of the bond, the agreement is not considered fully performed until the final inspection of the house in its new location has occurred and the City has approved installation of the house on its foundation.

9.   If Emmert fails to perform all the conditions imposed by the agreement, the City proceeds with demolition.

The City notified Emmert that the permits necessary to move the House to the location on Jackson Street were available and would be issued when Emmert signed the Final Agreement. However, Terry Emmert refused to sign the Final Agreement because he found repugnant several of its provisions, including the waiver-of-claim provision which forms one basis for this lawsuit. Emmert refused to accept 1) the "time line" set out in the Final Agreement; 2) the requirement of partial reimbursement for costs

15  – **AMENDED** OPINION AND ORDER

incurred by the City in the abatement effort; 3) the requirement
that Emmert make certain agreements with the demolition
contractor that had been hired by the City; 4) the requirement
that Emmert pay certain fees, including the systems development
charge; and 5) the requirement that Emmert obtain a specified
bond.

The Final Agreement was never signed, the permits were
never issued, and, ultimately, the City proceeded with abatement
and demolished the House during the first week of July, 2003.

### Allegations of the Amended Complaint

The Amended Complaint alleges that on several occasions in
2002 and 2003, Emmert attempted to obtain from the City permits
to move the House to various locations, but each time, the City
illegally and unreasonably thwarted Emmert's efforts by refusing
to grant the permits, or the necessary variances or waivers.

Emmert asserts four claims for relief, three based on
deprivation of due process and equal protection and one for
breach of contract.

As its first claim for relief, Emmert claims that the City
deprived it of a protected property interest by refusing to grant
the necessary permits to move the structure. Emmert claims it had
a "legitimate claim of entitlement" to the permits, and when it
was deprived of the permits, its due process rights were
violated.

16  – **AMENDED** OPINION AND ORDER

Emmert's second claim for relief is titled, "Unconstitutional Exaction of Constitutionally Protected Liberty Interest." For this claim, Emmert asserts that in

> demanding that Emmert release the City and promise not to bring claims against it relating to the structure, the City exacted an unconstitutional deprivation of a liberty interest with no nexus between the exaction and the permits, and thereby deprived Emmert of Emmert's constitutionally protected liberty interest in access to the courts, without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

It is not stated in the Amended Complaint whether these asserted deprivations are of procedural due process or substantive due process, but Emmert states in its responsive brief that it is not asserting a procedural due process claim. Plaintiff's Memorandum in Opposition, at 4-5.

The third claim for relief is for violation of equal protection. For this claim, Emmert alleges that the City's denial of the necessary permits, to which Emmert "had a claim of entitlement," was "arbitrary, capricious, and not consistent with the treatment of other permit applicants."

The fourth claim for relief is for breach of the '02 Contract. Emmert alleges that the City breached both express terms of the '02 Contract, such as terms stating that the city would "deem acceptable" a location, that the City would "approve" a new location, and that the City would "issue" the proper

17  – **AMENDED** OPINION AND ORDER

permits, and the implied covenant of good faith and fair dealing.

## Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995). On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. Clicks Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).

## Discussion

### A.  Has Emmert made out a *prima facie* case of municipal liability for the conduct of the Planning Director?

The City contends that claims one and three, based on the failure to issue permits, are precluded by Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978), because Emmert has not carried its burden of showing that Gessner, the City's Planning Director, was a policymaker.

Congress intended the term "person" in 42 U.S.C. § 1983 to include municipalities. Christie v. Iopa, 176 F.3d 1231, 1234

(9th Cir. 1999). However, Congress did not intend to create
*respondeat superior* liability, *see* <u>Monell</u>, 436 U.S. at 691 and
<u>Board of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397,
403 (1997).

Municipalities are liable only when "action pursuant to
official municipal policy of some nature caused a constitutional
tort." <u>Monell</u>, 436 U.S. at 691; <u>Pembaur v. City of Cincinnati</u>,
475 U.S. 469, 479-80 (1986). To impose municipal liability under
§ 1983 for violation of constitutional rights, a plaintiff must
show: 1) that he had a constitutional right; 2) that he was
deprived of this right; 3) that the City had a custom or policy
created by those who may fairly be said to determine official
policy; 4) that the custom or policy amounted to at least
deliberate indifference to the plaintiff's constitutional rights;
and 5) that the custom or policy was the moving force behind the
constitutional violation. <u>Plumeau v. School Dist. # 40 County of
Yamhill</u>, 130 F.3d 432 (9th Cir. 1997); <u>Blair v. City of Pomona</u>,
223 F.3d 1074, 1079 (9th Cir. 2000).

Alternatively, the governmental entity may be liable if it
has a "policy of inaction and such inaction amounts to a failure
to protect constitutional rights." <u>Oviatt ex rel. Waugh v.
Pearce</u>, 954 F.2d 1470, 1474 (9th Cir. 1992), *citing* <u>City of
Canton v. Harris</u>, 489 U.S. 378, 388 (1989); *see also* <u>Lee v.
County of Los Angeles</u>, 250 F.3d 668, 681 (9th Cir. 2001). The

custom or policy of inaction, however, must be the result of a "conscious" or "deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." <u>Lee</u>, 250 F.3d at 681.

Policy, custom or practice may be proven in one of three ways. First, plaintiff can prove that an employee acted pursuant to a "formal government policy or longstanding practice or custom which constitutes the standard operating procedure" of the municipality. <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996). Emmert has not alleged a formal policy or longstanding practice or custom. Alternatively, plaintiff may show that a municipal official "with final policy-making authority" acted to deprive plaintiff of his rights and that those actions were therefore "an act of official government policy." <u>Id</u>. Although a single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom, <u>Christie</u>, 176 F.3d at 1235, a municipality can be liable for an isolated constitutional violation when the person causing the violation 1) has final policymaking authority for the action alleged to have caused the particular constitutional or statutory violation at issue and 2) was the policymaker for the local governing body for purposes of the particular act. <u>McMillan v. Monroe County, Alabama</u>, 520 U.S. 781, 785 (1997); <u>Weiner v. San Diego County</u>,

20  – **AMENDED** OPINION AND ORDER

210 F.3d 1025, 1028 (9ᵗʰ Cir. 2000). The single decision may be sufficient to trigger § 1983 liability under <u>Monell</u> even though the decision is not intended to govern future situations. <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1347 (9th Cir. 1992).

Although the City concedes that the City Manager is a policymaker, Emmert argues that the imposition of municipal liability is warranted on the basis of Gessner's acts as well, because the City has failed to offer evidence that Gessner is not a final policymaker. This argument is unpersuasive; the burden is on Emmert to prove, or on summary judgment establish a material question of fact, that the conduct complained of was that of a municipal policymaker. *See* <u>Trevino</u>, 99 F.3d at 918. Emmert's mere statement that the Planning Director was, under state and local law, "possibly" a final policymaker for purposes of contracting with persons seeking to relocate buildings is also unpersuasive, in the absence of any authority or facts to support this statement.

I conclude that under <u>Monell</u>, the City is not liable for any of the acts of Gessner, the Planning Director. The City is entitled to summary judgment on claims one and three on this basis. However, even if Gessner were a policymaker, the City is entitled to summary judgment on all of Emmert's constitutional claims.

///

**B.    First Claim for Relief: Can Emmert establish a constitutionally protected property interest in the issuance of permits by the City?**

1. Fifth Amendment takings claim

The City asserts that Emmert is precluded from asserting a substantive due process claim because such a claim is preempted when a particular amendment provides an explicit textual source of constitutional protection. When an explicit textual provision of the Constitution protects against the challenged government action, the claim must be analyzed under that specific provision alone and not under the more general guarantee of substantive due process. Armendariz v. Penman, 75 F.3d 1311, 1325-26 (9th Cir. 1996)(en banc). The City argues that Emmert's claim is one properly brought under the takings clause of the Fifth Amendment. See, e.g., Esplanade Properties, LLC v. City of Seattle, 307 F.3d 978, (9th Cir. 2002)(takings clause of the Fifth Amendment provides an explicit textual source of constitutional protection).

I disagree with the City that Emmert's claim is cognizable under the takings clause. To establish a prima facie takings case under the Fifth Amendment, the plaintiff must establish both that the interest at issue was its private property and that the property was taken without just compensation. Washington Legal Found. v. Legal Found. of Washington, 271 F.3d 835, 851 (9th Cir. 2001), aff'd sub nom. Brown v. Legal Foundation of Washington,

22  – **AMENDED** OPINION AND ORDER

538 U.S. 216 (2003). An allegation that private property for which no compensation is due has been taken is insufficient to sustain a Fifth Amendment claim because it is the taking *without just compensation* that is constitutionally prohibited. Id.

Emmert has made no allegation that it was entitled to compensation from the City for the demolition of the House, nor could it, under the facts of this case. The House had been declared a nuisance and was the subject of abatement proceedings before Emmert acquired it. Additionally, for reasons discussed below, Emmert had no property interest in the permits. I conclude that the Fifth Amendment's takings clause does not provide a remedy for the governmental action challenged here.

### 2. Substantive due process

The concept of substantive due process forbids the government from depriving a person of life, liberty, or property in such a way that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998), *quoting* United States v. Salerno, 481 U.S. 739, 746 (1987). *See also* Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 948-49 (9th Cir. 2004). Thus, to make out a substantive due process claim, Emmert must show two elements: a protectible interest and egregious official conduct.

///

23  – **AMENDED** OPINION AND ORDER

a.    Protectible interest

The first element requires the plaintiff to show a liberty or property interest protected by the Constitution. <u>Wedges/Ledges of California, Inc. v. City of Phoenix</u>, 24 F.3d 56, 62 (9th Cir. 1994), *citing* <u>Board of Regents v. Roth</u>, 408 U.S. 564, 569 (1972); *see also* <u>Dittman v. California</u>, 191 F.3d 1020, 1029 (9th Cir. 1999). Property interests are not created by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Thornton v. City of St. Helens</u>, 425 F.3d 1158, 1164 (9th Cir. 2005), *citing* <u>Roth</u>, 408 U.S. at 577.

Emmert asserts that its property interest in the permits is "one which is constitutionally recognized as fundamental." Plaintiff's Memorandum in Opposition, p. 5.[5] However, Emmert relies on a line of cases holding that denial of a *building permit* by a zoning authority, after the property owner has satisfied all the requirements of the permit, can give rise to a substantive due process claim. *See, e.g.*, <u>Bateson v. Geisse</u>, 857

---

[5] The argument that Emmert's constitutional property interest was violated by the City's failure to issue permits in a timely enough fashion to enable Emmert to move the House is directly undercut by Justice Scalia's statement that "[f]reedom from delay in receiving a ... permit is not among these "fundamental liberty interests.'" <u>City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation</u>, 538 U.S. 188, 200 (2003)(Scalia, J., concurring).

24  – **AMENDED** OPINION AND ORDER

F.2d 1300, 1302 (9th Cir. 1988). In <u>Bateson</u>, the City's
regulations provided that once an applicant's building plans
complied with the code and other applicable laws, and the fees
are paid, the building official *must* issue a building permit to
the applicant. The regulations did not provide for review by the
City Council before a building permit could issue. Nevertheless,
the City Council voted to withhold plaintiff's building permit
without providing plaintiff "any process, let alone 'due'
process." 857 F.2d at 1303. The court concluded,

> This sort of arbitrary administration of the local
> regulations, which singles out one individual to be
> treated discriminatorily, amounts to a violation of
> that individual's substantive due process rights.

<u>Id</u>.

But the facts of this case are very different from those of
<u>Bateson</u>. There is no state law or municipal ordinance--like the
regulation in <u>Bateson</u> that required issuance of a building permit
once the requirements were satisfied--creating a property
interest for Emmert in a moving permit or any other permit
necessary to accomplish the relocation of the House, particularly
since the House had already been designated a nuisance and
scheduled for demolition before Emmert bought it.

Emmert argues that its claim of entitlement to the permits
is based on the nondiscretionary language of the City's Municipal
Code, Section 15.04.200, Plans and Permits, which requires

issuance of a permit once the conditions are met:

> The application, plans, specifications, and
> computations and other data filed by an applicant for
> a permit shall be reviewed by the building official.
> ... If the building official finds that the work
> described in application for a permit and the plans,
> specifications and other data filed therewith conform
> to the requirements of this chapter and other
> pertinent laws and chapters, and that the fees have
> been paid, the building official shall issue a permit
> therefor to the applicant.

Corrigan Declaration, Exhibit 16, p. 14.

But Emmert acknowledges that it has not in fact satisfied all the permit requirements. Emmert attempts to get around this problem by arguing that there is a triable issue of material fact as to whether Emmert was prevented from meeting the permit requirements by the City, but there is no factual evidence that the City prevented Emmert from obtaining the necessary permits. Rather, the evidence indicates that Emmert's failure to find an appropriate site, obtain the permits, and move the House was the result of a number of factors, many of them not within the City's control.

There is no dispute that the reason Emmert was unable to obtain the Housing Authority site on Balfour Street was the Clackamas County Commission's refusal to grant a utility easement. There is no dispute that the reason Emmert decided not to move the House to the lot on Malcolm Street was that the utility fees made the site unreasonable. There is no dispute that

the Jackson Street location was initially made unfeasible by the adjoining property owners' refusal to convey the strip necessary to make the lot a legal size. The City had nothing to do with these events.

The only other source for a protectible property interest is the "understanding" between Emmert and the City documented in the '02 Contract. But the '02 Contract does not impose any obligations on the City with respect to Emmert--it merely recites that the City will release Richard Peterson from liability for nuisance abatement. The obligations created by the '02 Contract fall almost entirely on *Emmert.* Emmert is "solely responsible for moving the building from its present temporary location to a new location approved by the city," and Emmert is required to "promptly" move the House, "secure the necessary moving permit and any other necessary permits" and situate the House in a location "deemed acceptable by Milwaukie." Emmert's allegation in the Amended Complaint that the '02 Agreement provided that the City would "deem acceptable" a location, that the City would "approve" a new location, and that the City would "issue" the proper permits is simply incorrect. Such language does not appear in the text of the '02 Contract, and nowhere in the '02 Contract is there any provision suggesting that the City was obligated to issue permits to Emmert or to approve any location Emmert might select for the House.

27  - **AMENDED** OPINION AND ORDER

Emmert did not meet all the necessary conditions for issuance of a permit, and for that reason cannot assert the same protectible property right in the permits that the court found in <u>Bateson</u>. Further, Emmert cites no authority for the proposition that the City was required to assist Emmert in satisfying the preconditions for the permits or otherwise create the conditions necessary to create a protectible property interest for Emmert.

      b.    Egregious official conduct

Only the most egregious official conduct can be said to be arbitrary in the constitutional sense. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998). The Supreme Court's cases dealing with abusive executive action have "repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" <u>Id.</u> The constitutional concept of conscience-shocking

> duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability. Thus, ... the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm.

<u>Id.</u> The Constitution "does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." <u>Id.</u>

///

The '02 Contract was executed on October 31, 2002, and the City finally demolished the House eight months later, in July 2003. According to the evidence before the court, Emmert did not apply for a permit to move the House until after it purchased the Jackson Street property, in June 2003, well past the April 27, 2003 deadline that Emmert had requested and that the City Council had granted.

The correspondence and e-mails set out in detail above indicate that the City, particularly Swanson and the City Council, were more generous to Emmert than required by the terms of the '02 Contract. Nor did the City prevent Emmert from signing the Final Agreement, which would have enabled Emmert to delay the nuisance abatement long enough to obtain the variance for the Jackson Street site. Although Emmert contends that it refused to sign the Final Agreement because of the requirement that it waive any claims against the City, Emmert does not deny that it refused to agree to several other provisions in the Final Agreement as well, as discussed above.

I find no evidence in the record that would support a claim of egregious official conduct under the Supreme Court's definition.

Emmert has not shown either that it had a constitutionally protected entitlement to the permits necessary to move the house, or that the City's conduct was so egregious as to "shock the

conscience." The City is entitled to summary judgment on this claim.

    **C. Second Claim for Relief: Was Emmert deprived of a constitutionally protected liberty interest in access to the courts?**

As its second claim for relief, which is also a substantive due process claim, Emmert asserts that by "demanding that Emmert release the City and promise not to bring claims against it relating to the structure," the City "deprived Emmert of [its] constitutionally protected liberty interest in access to the courts, without due process of law."

The City argues that a major flaw in this claim is that due process is required only when there has been a *deprivation* of a constitutionally protected right to life, liberty or property, and there was no deprivation here, because Emmert never signed the Final Agreement and therefore never waived any right to assert a claim against the City. Thus, the City contends, at most there was an *attempted* deprivation of Emmert's access to the courts.

Emmert responds that the fact it never signed the Final Agreement is immaterial because by not signing the Final Agreement, Emmert "lost the practical ability to negotiate the agreement and obtain the permits." Emmert characterizes this as a "lose-lose" situation which falls under the doctrine of "unconstitutional conditions."

The doctrine of unconstitutional conditions provides that the government cannot condition the receipt of a government benefit on waiver of a constitutionally protected right. The doctrine applies even though a person has no "right" to a valuable governmental benefit and "even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." Perry v. Sinderman, 408 U.S. 593, 597 (1972). The rule is intended to ensure that the government is unable to indirectly restrict constitutional rights that it is powerless to restrict directly.

Emmert's legal authority for its position is Louisiana Pacific Corp. v. Beazer Materials & Services, Inc., 842 F. Supp. 1243, 1254 (E.D. Cal. 1994). In that case, the court concluded that the doctrine of unconstitutional conditions can apply in a settlement context, that the applicant need not have an absolute right to the governmental benefit sought, and that the applicant need not accept the government's proposal in order to state a claim.

Beazer involved the allocation of the cost of cleaning up two Superfund sites. The original action was brought by Louisiana Pacific (LP) against Beazer East, Inc., and sought costs expended by both LP and the Environmental Protection Agency (EPA) in the course of investigating the sites. The United States came into the case, seeking to recover from LP its response costs. LP then

filed a third party complaint against Beazer and Woodward-Clyde Consultants. The issue pertinent to the case before this court was asserted in LP's motion for summary judgment against the United States's complaint, on the ground that the United States was precluded as a matter of law from recovering its response costs for the LP site because it had unlawfully conditioned LP's opportunity to conduct its own, potentially lower cost investigation, on LP's waiver of various due process rights. The court denied LP's motion for summary judgment.

LP asserted that the United States had created an unconstitutional condition when it conditioned consent to LP's conducting the investigation on 1) LP's stipulation to severe penalties in the event that it failed to properly and timely complete future unspecified work, even if there were a good faith dispute about the work; and 2) a waiver of judicial review of the stipulated penalties.

The Beazer court concluded that evaluating an unconstitutional conditions allegation in the context of settlement negotiations requires a three step analysis: 1) plaintiff must establish that a constitutional right is implicated; 2) plaintiff must demonstrate that the right is being impinged upon as measured by standards applicable to a direct violation of the identified constitutional right; and 3) if the plaintiff satisfies the first two conditions, the government must

demonstrate the propriety of seeking a waiver of a constitutional right in light of both its legitimate interest in a waiver, if any, and the benefit to be conferred upon the adverse party. The Beazer court applied this analysis and concluded that, even though the United States's offer implicated LP's due process rights to judicial review, was grounded on an unreviewable right to define the extent of LP's future liability based on facts not yet in existence, and offered LP benefits that were at least potentially illusory,[6] the United States was still entitled to summary judgment dismissing the claim.

When the Beazer court's reasoning is applied to the facts of this case, Emmert's unconstitutional conditions claim must still fail. I assume, for the sake of argument, that because the issue in this case is framed in the context of an offer to compromise potential litigation, the right impinged upon is that of judicial review. Thus, the first inquiry articulated in Beazer is satisfied. However, that being said, I note that in this case,

_____

[6] Under the terms of the United States's offer,

LP was exposed to truly punitive daily penalties without judicial review. Thus the economic benefit LP obtained under the proposed settlement was subject to complete defeat, essentially at the sole discretion of the agency. In sum, LP was presented with two unenviable choices, continue to litigate at great expense under a statute which imposed strict liability, or settle without any realistic limitation on potential liability.

842 F. Supp. at 1254.

unlike Beazer, the offer of compromise is grounded primarily--
though not entirely-- on the "resolution of presently contested
issues relating either to the existence of liability or its
extent, as measured by events which have already transpired." 842
F. Supp. at 1250. In Beazer, the United States's proposed
settlement "was not a mutually agreed upon resolution of
presently disputed issues arising out of historical events," but
rather "an unreviewable right to define the extent of LP's future
liability premised on its evaluation of facts not yet in
existence or, at the very least, not yet ascertained." Id. The
difference is significant. In this case, Emmert was presented
with an agreement under which it would release both existing
claims against the City based on historical events, and its
future rights to contest the potential denial of permits Emmert
was required to, but had not yet, applied for. The latter release
is similar to that sought in Beazer by the EPA. In Beazer, LP was
being asked to agree in advance to the imposition of penalties
for conduct not yet engaged in, without the right of judicial
redress.

The third factor of the Beazer court's analysis is
consideration of the waiver sought in light of the government's
legitimate interest, if any, in the waiver, and the benefit to
the adverse party. As the Beazer court noted,

///

34  - **AMENDED** OPINION AND ORDER

> Before the government can require a citizen to
> surrender a constitutional right as part of a
> settlement it must have a legitimate reason for
> including the waiver in the particular agreement. A
> legitimate reason will almost always include a close
> nexus--a tight fit—-between the specific interest the
> government seeks to advance in the dispute underlying
> the litigation involved and the specific right
> waived.

842 F. Supp. at 1253, *quoting* Davies v. Grossmont Union High

School Dist., 930 F.2d 1390, 1399 (9th Cir. 1991). In Beazer, the

court held that EPA's ability under the offer to satisfy its

statutory obligations without prolonged litigation was a

legitimate governmental interest, and that the constitutional

right sought to be waived was directly implicated by the benefit

the government sought. "Put another way, the Government sought

the waiver of the right of judicial review because the benefit of

settlement is a termination of litigation." Beazer, 842 F. Supp.

at 1253-54. The Beazer court acknowledged that while the

proffered settlement was desirable from the standpoint of the

United States, the possible benefit to LP was, "at least

potentially, illusory," because the economic benefit LP obtained

under the proposed settlement was subject to complete defeat,

essentially at the sole discretion of the agency." Nevertheless,

the court held that the United States' settlement offer passed

judicial scrutiny because the minimal advantage to LP had to be

considered "in light of the litigation posture of the parties and

the statutory scheme." Id. at 1254. The Beazer court concluded

35  – **AMENDED** OPINION AND ORDER

that because "CERCLA stacks the deck in favor of the Government, it is not unreasonable for it to offer little to the defendant to induce settlement." Id. Accordingly, the court held that, considering the goals of CERCLA and the mission of the EPA, "the court cannot say that the Government was unjustified in offering to permit LP to do the [investigation] only upon surrender of the right of judicial review." Id. at 1255.

The same considerations apply here, perhaps more forcefully, to require dismissal of this claim. The Final Agreement was proffered to Emmert on June 17, 2003, long after the City's April 28 deadline for the nuisance declaration, and almost two weeks after Judge Gray had signed the warrant requiring the City to commence execution within 10 days. At that point, Emmert had been trying unsuccessfully to find a suitable location for the House for eight months, and had very little leverage left with respect to obtaining a permit from the City. Essentially, Emmert was at the point of having failed, through no fault of the City, to timely act to protect its interests, whatever they might be, in the House. The City was not required to offer Emmert anything. It could have proceeded to abate the nuisance by demolishing the House. Instead, the City offered Emmert yet another "last chance" in the Final Agreement, which was reasonably tied to the legitimate interest of the government in both ending the nuisance, and ending the entire process of

resolving the nuisance which had been prolonged by Emmert. It is, as in <u>Beazer</u>, reasonable for the City to strive to resolve its obligations under the nuisance ordinance without prolonged litigation, so that the right it sought to have Emmert waive was directly implicated in the benefit the City sought. There is a "tight fit" between the City's interest in the dispute and the specific right waived.

I find nothing in <u>Beazer</u> to suggest that the present claim, if proven, is sufficient to establish unconstitutional conditions. On the contrary, <u>Beazer</u> suggests this claim should be dismissed.

The City is entitled to summary judgment on this claim.

**D.    Third Claim for Relief: Has Emmert made out a claim for violation of the Equal Protection clause?**

For its third claim for relief, Emmert asserts that the City violated the equal protection clause by arbitrarily and capriciously denying permits in a manner inconsistent with the way other applicants for permits were treated. See Amended Complaint ¶ 23.

Emmert is a corporation, and so cannot allege membership in a protected class such as race or gender, as Emmert concedes. Emmert characterizes its equal protection claim as one involving a "class of one," in which a plaintiff has been intentionally treated differently from others similarly situated, with no

rational basis for the difference in treatment. *See* <u>Village of
Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000).

Emmert asserts that Peterson, the former owner of the
House, was treated differently from Emmert, because when
abatement loomed for Peterson, the City recruited Emmert as a
buyer for the house, while for Emmert, the City "blocked his path
to a successful move." Emmert contends that this amounted to a
selective enforcement, done for irrational and hostile motives,
citing to the City's "deliberately hiding information from an
elected official for Clackamas County,"[7] using its power to block
Emmert from complying with the permit requirements, and keeping
Emmert from receiving help that would bring the moving project to
completion.

As the City points out, there is no evidence before the
court that Peterson's situation was the same as Emmert's--*i.e.*,
that in Peterson's case, the abatement process had proceeded to
the point where the City Council declared the House a nuisance
and established a deadline for its abatement by demolition. The

---

[7] There is no evidentiary support for this assertion. The
evidence shows that Gessner testified at his deposition that a
County employee, Gary Dicenzo, asked Gessner to keep some
unidentified information confidential until the Clackamas County
Commissioners, sitting as the Housing Authority board, made its
decision about the Balfour site. Gessner testified that the
information was to be kept from the general public, not the
Clackamas County Commissioners. Gessner stated that he received no
requests for any information that he considered confidential
pursuant to this agreement.

City argues that Emmert also fails to take into account the continuing deterioration of the House and the City Council's progression toward demolition during the seven months between Emmert's acquisition of the House and the presentation of the Final Agreement.

Emmert has proffered no facts which show that Emmert was treated differently from others in the same situation, based on an invidious motive. The facts before the court tend only to show that, for many reasons, the relocation of the House could not be accomplished within a reasonable amount of time. While it may be possible to infer from some of the facts that the Planning Director or the City Manager could have been more helpful to Emmert, this does not raise a material issue of fact that Emmert was intentionally treated differently. It can also be inferred from other facts that the City Council, the City Manager and the Planning Director made unusual efforts to facilitate Emmert's removal of the House, and from still other facts that Emmert was responsible for the failure of the project.

The City is entitled to summary judgment on this claim.

### E.    The City's Motion to Strike Matesi Declaration

The City moves to strike as sham Paragraph 3 of the Matesi Declaration. The Declaration states that the Final Agreement proposed by the City had "some problems from Emmert's perspective but they were negotiable," and that although "there were other

terms Emmert was still negotiating, the [waiver of claim] requirement was the "deal breaker," without which Emmert "would have signed the Agreement ..." Matesi's deposition testimony contains statements to the effect that Emmert's position was that it would not agree to paying the fees set out in paragraph 8 of the Final Agreement, would not agree to accept the bond proposed by the City, would not agree to pay the fees, including system development charges, payable at the time of building permit issuance, and would not agree to pay the total amount of the permit and other fees.

The court may disregard sham affidavits that contradict deposition testimony submitted solely to generate an issue of fact. Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991). The court determines whether an inconsistent affidavit is a sham or is the result of an honest discrepancy, a mistake, or the result of newly discovered evidence. Id.

The deposition testimony directly contradicts Matesi's statement in her declaration that all the provisions of the Final Agreement were "negotiable" except for the waiver of claim provision. The City's motion to strike Paragraph 3 of the Matesi Declaration is granted.

### Conclusion

The City's motion for summary judgment on the First, Second and Third Claims for Relief (doc. # 27) is GRANTED. The City's

motion to strike paragraph three of the Matesi Declaration (doc. # 56) is GRANTED.

Emmert submitted a letter to the court on June 30, 2006, in response to the court's request at oral argument for comment from the parties on where this case should be heard if the City's motion for summary judgment were granted. In the letter, Emmert's counsel, Jonathan Clark, expressed the opinion that the case should be remanded to state court, because "[t]he only remaining claim at that time would be a breach of contract claim, and we have no interest in using federal court resources for a state law dispute."

Emmert's request is construed as a motion to remand, and the court grants the motion. The breach of contract claim is remanded to state court.

IT IS SO ORDERED.

Dated this 30th day of August, 2006.


_____    /s/  Dennis James Hubel___

                        Dennis James Hubel
                        United States Magistrate Judge


41  – **AMENDED** OPINION AND ORDER